EDITH ANDREWS LOGAN, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 5508, 5916–5918, 6014, 6436–6438, 18202.   Promulgated June 14, 1928.

*John W. Ford, Esq., Millard F. Tompkins, Esq.,* and *Walter M. Anderson, Esq.,* for the petitioners.

*L. C. Mitchell, Esq.,* for the respondent.

---

[1] The following proceedings were heard with the above and are decided herewith: Henry W. Heedy, Docket No. 5916; William J. Hitchcock, Docket No. 5917; Frank Hitchcock, Docket No. 5918; William M. Andrews, Docket No. 6014; Carrie L. Shaw, Executrix, Estate of John Shaw, Deceased, Docket Nos. 6436, 6437, and 6438; Julia Andrews Bruce, Docket No. 18202.

588

## OPINION.

SMITH: In the petition of Edith Andrews Logan it is stated that "the tax in controversy is income tax for the years 1915 to 1920, inclusive, and is more than $10,000 to-wit, $22,048.63." The notice of deficiency attached to the petition shows overassessments for the years 1915, 1916, and 1917, covered by claims filed in the aggregate amount of $1,951.48, and deficiencies in tax for the years 1918, 1919, and 1920 in the aggregate amount of $22,048.63. The pleadings do not present basic facts showing that the Board has any jurisdiction to determine the correct tax liabilities for the years 1915, 1916, and 1917, and the petitioner in her brief makes no reference to those years. The appeal is accordingly dismissed in so far as it relates to the years 1915, 1916, and 1917.

The remaining issues presented by these proceedings are the same as those presented in *Julia Andrews Bruce,* 5 B. T. A. 300, wherein we held that the transaction which took place in 1916 was a completed sale and that the amounts of money received by the petitioners during

the tax years under the contract of March 11, 1916, were in part a return of capital and in part taxable income. It was argued before the Board in those proceedings, as it is argued by counsel for the present petitioners, that the interest of the petitioners in the contract of March 11, 1916, had no fair market value in 1916 and that, therefore, the transaction was not a closed one and that the petitioners were not liable to income tax upon moneys received in future years under the contract until they had recovered back the cost or fair market value on March 1, 1913, whichever was higher. In the opinion we stated:

> The petitioners have also raised the point that there was no market value for the contract right received by Julia Andrews Bruce and Louisa Andrews in 1916. The only testimony offered in support of these contentions was by Hitchcock, former president of the Andrews & Hitchcock Iron Co. This witness testified that in the negotiations for the sale of the stock there was no discussion concerning a full cash payment, because the buyer, the Youngstown Sheet & Tube Co. could not afford to pay cash in full. This is all the testimony offered in support of the allegation that the contract to receive future payments had no market value.

The present petitioners contend that unlike the *Julia Andrews Bruce* case, *supra*, they have offered affirmative proof showing that the contract of March 11, 1916, under which their shares of stock were sold, in so far as the future indeterminate payments were concerned, had no fair market value.

Frank Hitchcock, the president of the Andrews & Hitchcock Iron Co. on March 11, 1916, testified at the hearing of the present cases:

> Q. Mr. Hitchcock, at that time, namely, March 11, 1916, did you know of any market where you could have obtained, or did you know of any market where could be sold, an interest of 12% of the stock of the Mahoning Ore & Steel Company?
>
> A. No, not at its value.
>
> Q. Mr. Hitchcock, in 1916, was there any price established by public sale or sales in the way of ordinary business, of similar contracts to this contract of March 11, 1916, by which the fair market value of the contract at that time, at the time it was made, could be determined?
>
> A. No.
>
> Q. Was there in 1916 any general market for contracts of this character, and any established or current market price?
>
> A. No.

John B. Putnam, connected with Pickands, Mather & Co., Cleveland, Ohio, likewise testified that in his opinion there was no fair market for the several petitioners' interests in the contract of March 11, 1916; that the vendors on any sale of this contract in 1916 could not have readily realized in cash or its equivalent its real value.

J. C. Agnew, mining engineer who was connected with the Mohoning Ore & Steel Co. from 1904 to 1923, testified:

595

Q. In 1916, was there any price established by public sales or sales in the way of ordinary business, of similar contracts, by which the fair market value of that contract at the time it was made could be determined?
A. No.
Q. Was there, in 1916, any general market for contracts of that character, and any published or current market price for the same?
A. Not to my knowledge.
Q. In your opinion, could the vendors or sellers under that contract, on any sale of the contract, have realized in 1916 in cash or its equivalent its real value?
A. No, I do not think so.

Of the above witnesses, Hitchcock and Agnew testified before the Board in *Julia Andrews Bruce, supra.* The only additional witness for the petitioners in the present proceedings is John B. Putnam. He did not profess to be an expert on any subject connected with mining and did not claim to have anything more than general information as to any subject connected with these proceedings. He stated that he was generally familiar with iron-ore contracts. He also stated:

There have been sales of iron ore mines, but I am not familiar with any except in a general way.

Two mining engineers testified for the respondent that in their opinion it was practicable and feasible to estimate both the reserve and probable life of the Mahoning mine. Both of these men were familiar with the property in controversy. One of the engineers had taken part in formulating the Commissioner's determination as to the probable life of and as to the tonnage of ore in the mine. He stated that the pit operated by the Mahoning Company adjoined another pit known as the Hall Rust Mine, on adjoining property, and that the two properties constituted one mine from a physical standpoint and that it was the largest developed iron mine in the United States. The iron is found in a well defined formation and is one of the best grades of iron ore in the United States. Above the iron ore is the surface or overburden of glacial drift, varying from 5 to 30 feet in thickness. He stated:

The physical conditions make it feasible to estimate the ore content. You can make a very accurate estimate of it. I would say the degree of accuracy obtained in estimating ore reserves in this property will be much higher than at any other mine that I know of, because of the geographical conditions and the development of the work, the drill work, and the activity of adjacent properties * * . *. I do not know of any mining section where it is as easy to make an estimate of ore reserve as it is on the Mesaba.

The stipulation filed in these proceedings shows that the respondent estimated ore reserves and probable life as of 1916 and also as of 1913. The estimate of reserve in 1913 when modified by the ore mined between 1913 and 1916 is within one-half of one per cent of

the 1916 estimate. In 1913 the probable life was estimated at 40 years and in 1916 at 45 years. On this point one of the engineers for the respondent testified:

The Commissioner's appraisals of 40 years as of March 1, 1913, and 45 years as on March 11, 1916, are very consistent because they were made as of different basic dates. In each case you had a different set of facts on which to base the valuation. In the later appraisal you had additional history of three years to consider. The production for those three years was slightly less than 2,000,000 tons a year and during those three years the demand for iron ore was about the average.

All of the mining engineers who testified before the Board agreed that the production of a mine of the character of the Mahoning mine here involved is strongly influenced by the general conditions of business in the country. They were agreed that in times of prosperity the production will be greater than in times of depression. J. C. Agnew, testifying for the petitioners, stated:

The demand for iron ore bears a very close relation to the general prosperity of the country  *  *  *

In estimating the future production of the Mahoning mine as of 1916 the general demand in this country for iron ore would certainly be an important factor. Another important factor would be the condition of the industry in this country, whether times were prosperous or otherwise.

The two Government engineers concurred in this view.

Upon the basis of data furnished by the Mahoning Ore & Steel Co., the respondent determined that the ore in place as of March 11, 1916, was 82,858,535 tons. It is in evidence that this estimate did not take into consideration ore, if there was any, in approximately 400 acres of land controlled by the company. No evidence has been adduced before the Board that would prove the inaccuracy of the estimate. The doubt, if any exists, is as to the length of time it will take to mine the ore. Upon the basis of data furnished by the Mahoning Co. the respondent estimated that the life of the mine would be 45 years from March 11, 1916, and that the average annual production would be 1,841,300 tons. During the 11-year period from 1916 to 1926, inclusive, the total production was 19,272,242 tons, or an average annual production of 1,752,000 tons.

The contract which the stockholders of the Andrews & Hitchcock Iron Co. had with the Youngstown Sheet & Tube Co. was that they should receive 60 cents per ton upon their 12 per cent interest in the ore mined from the Mahoning mine. The important question in the case is as to whether that contract had a fair market value as of March 11, 1916. The petitioners contend that they could not have gotten a fair market value for their interests in the contract if they had attempted to sell them. Witnesses for the petitioners believed that the true value of the interest of each of the petitioners was much in excess of what each could have sold it for. This question

of belief does not, however, in our opinion satisfactorily establish that the interests had no fair market value. In 1916 it could be foreseen that each of the petitioners would receive considerable amounts of money under the contract during the years immediately succeeding 1916. It is hardly probable that persons conversant with the contract would not have given something for the interests of the several petitioners therein. Statements that the contract had no value because in the opinion of certain witnesses the interests of petitioners therein could not have been sold at their full market value is not satisfactory evidence that they did not have a fair market value.

In support of their contention that the contract of March 11, 1916, had no fair market value in 1916, the petitioners cite the decision of the court in *Bourne* v. *McLaughlin*, 19 Fed. (2d) 148. We are of the opinion that that case is readily distinguishable from the cases at bar and is not controlling here. In that case the court expressly stated that the stock could not have been disposed of " except at such a sacrifice as to amount to a virtual donation," and that attempts to sell the stock were unsuccessful. There is no such evidence before the Board in the proceedings at bar.

Upon the record made we are of the opinion that the contract received by the petitioners as a part consideration for their holdings in the Andrews & Hitchcock Iron Co. had a determinable fair market value when received by them in 1916. No evidence has been adduced that the determination of the Commissioner of the fair market value of the interests of the several petitioners at the basic dates were in error, and in the absence of such evidence the determinations of the respondent of such values are approved.

The petitioners' contention that they derived no taxable income from payments made to them during the taxable years because up to the close of 1920 no one of them had received under the contract the admitted value of the property sold either as of March 1, 1913, or March 11, 1916, is very similar to that which was made before the Board in *Ruth Iron Co.*, 4 B. T. A. 1151, wherein it appeared that in January, 1913, the petitioners sold certain ore-bearing property and each of them received in exchange for its or his interest therein a certain amount in cash and 41 noninterest-bearing promissory notes, payable annually thereafter, endorsed by the United States Steel Corporation and further secured by a vendor's lien upon the property. Upon the facts presented we held that the amounts received by the petitioners upon the payment of their respective notes in the years 1919, 1920, 1921, and 1922 in excess of the fair market value of such notes on March 1, 1913, which value was in excess of cost, was taxable income. One of the petitioners in that case was Francis S. Kosmerl and from the adverse decision of the Board

appealed the case to the Circuit Court of Appeals for the Seventh Circuit. In an opinion handed down February 18, 1928, the order of the Board was affirmed. 25 Fed. (2d) 87. In the course of the opinion the court stated:

For petitioner a witness testified generally that at the time the notes were given the ore body was worth more than 35 cents per ton. But the ore at that time was plainly not worth that much to the owners, who had optioned it under the lease at 35 cents a ton, not payable in cash, but as and when it should be mined, over a period which, on January 1, 1913, had yet 41 years to run; so that while the lessee had the right to exhaust the property at 35 cents per ton, this might not, and probably would not, have been payable until many years after the date when the lease was abandoned and the sale consummated. So it appears that the actual consideration which passed from the owners was not a present 35 cents per ton, but that price over a period up to 41 years thereafter, thus greatly reducing the 35 cents per ton value of the consideration which passed in payment for the notes.

And so with respect to the notes themselves, which, by their terms, matured up to 40 years from their date, without interest. · That the notes were good is quite beyond dispute—good, however, only for their face value at maturity, but surely not good for their face value when made. That a note, however absolutely good the security, due 40 years from its date, without interest, is not worth its face at time of making is apparent from the mere statement. And so with the notes in question, paid in 1921 and 1922, eight and nine years from their date. Conceding these notes to have been capital assets of the taxpayer on their date, they were capital assets not for their face value but for the materially less amount which the notes were then actually worth; and in their payment at maturity there was plainly gain, profit or income to the extent of the difference.

In *Platt* v. *Bowers*, 13 F. (2nd) 951, the court dealt with a very similar situation, and held that while the annually maturing obligations represented capital assets, and were not taxable as gains, profits, or income, yet where the obligations were for serial annual payments without interest, under the acts of 1918 and 1921 there was, upon conversion of the obligations through their payment, profit to the extent of the difference between the value of the obligations on March 1, 1913, and the amount so realized thereon.

The above-referred to case is not an exact parallel to the cases at bar, for there the petitioners parted with a note during each taxable year and received the face value thereof. Here the petitioners parted with shares of stock in Andrews & Hitchcock Iron Co. in 1916 for a cash consideration and a contract entitling them to receive an amount per annum to the end of the lease held by the Mahoning Ore & Steel Co. based upon the amount of ore mined during each year. The number of tons of ore in the mine was susceptible of accurate determination and the amount of the ore to be mined annually over a period of years was likewise susceptible of. determination. If the difference between the present worth of the noninterest-bearing notes in 1913 in the *Kosmerl* appeal and the amount received during the taxable year was income of the taxable year we think that the application of the same principle to the proceedings at bar requires the

petitioners to return as taxable income a portion of the amount of royalties received each year. This was substantially the decision of the Circuit Court of Appeals, Third Circuit, in *Kate W. Rosenberger* v. *McCaughn*, 25 Fed. (2d) 699. The plaintiff in suing to recover the tax paid on amounts received under a mining lease entered into prior to March 1, 1913, claimed that inasmuch as under the Pennsylvania law the lease was treated as a sale of coal in place, the payments received should be treated as a return of capital. In the course of the opinion the court stated:

Reverting to the plaintiff's contention that all payments she had received under the instrument here in question were tax free because they were part payments of the purchase price of property sold prior to March 1, 1913, still—always keeping in view the nature of mining, the source of the proceeds—we think each payment represented in some measure both capital and increment, capital because it stood in the place of coal and increment because in the payments running through ninety-nine years interest on the capital must inevitably have been included, and that this increment or interest was a gain "derived" within the generalization of the statute "from any source whatever" and was income in substantially the sense of *New Creek Coal Company* v. *Lederer*, 295 Fed. 433 (4 Am. Fed. Tax Rep. 3769). The plaintiff can very properly demand that the capital included in her proceeds from mining shall not be taxed. *United States* v. *Ludey*, 274 U. S. 295 (6 Am. Fed. Tax Rep. 6754); *New Creek Coal Company* v. *Lederer*, *supra*. But when the capital in the proceeds has been determined and set aside the balance is income and is the very thing on which the Government lays its hands and exacts a tax. *Stratton's Independence* v. *Howbert*, 231 U. S. 399 (3 Am. Fed. Tax Rep. 2883); * * *

See also *Florence L. Klein*, 6 B. T. A. 617.

At the hearing of these proceedings counsel for the petitioners stated that they desired merely to submit to the Board these cases on the sole and particular question whether the 1916 transaction was a closed transaction and that if upon the evidence submitted the Board was of the opinion that it was a closed transaction then the deficiencies must be redetermined in accordance with the Board's decision in *Julia Andrews Bruce*, *supra*, in which the same contract was involved. Counsel for the respondent objected, however, to the redetermination of the deficiencies in accordance with the *Julia Andrews Bruce*, *supra*, decision and contended that the deficiencies should be redetermined to be the amounts found by the respondent.

In *Julia Andrews Bruce*, *supra*, we held:

* * * The Commissioner in his determination of the deficiency has determined the fair market value of the right to receive future payments, and from the evidence presented we can not say that his determination is not correct. A portion of each payment under the contract was a return of capital and a portion represented gain. The Commissioner has determined what portion is gain by dividing the 1916 value of the contract by the total tonnage to be obtained, reaching the conclusion that the payment for each ton represents 19.53 cents return of principal and 40.47 cents income, or, in other words, that

each payment, whether made one year after the agreement was made or 45 years thereafter, is made up 35.554 per cent return of principal and 67.446 per cent income.

The payments to all the stockholders were estimated by the Commissioner to be $132,573.60 annually for 45 years. These payments were reduced to present worth, using a discount of 6 per cent on future payments with a 4 per cent return on sinking fund. It is evident that the present worth of the payment to be received at the end of the first year differs substantially from the present worth of the payment to be received 45 years in the future. It is further evident that the present worth of all of the payments is the sum of the present worth of each annual payment, proper adjustment for the sinking fund being made. In determining what portion of the payment represented a return of the 1916 value, the Commissioner has made the allocation between principal and gain as if the present value in 1916 of each of the annual payments to be received was exactly the same. * * *

Our question now is whether we were correct in reaching the above conclusion. It will be noted from the foregoing that for the purpose of determining the amount of income received by each petitioner from the royalty payments the Commissioner considered that of each royalty payment received a part represented a return of the value of the contract on April 11, 1916, and the balance represented income. The amount of each royalty payment which represented a return of capital was determined by dividing the fair market value of the contract on April 11, 1916, by the estimated tons of ore in the mine on that date. The difference between the royalty payment of 60 cents and the foregoing amount was taken as the income received on account of each ton of ore mined. The income for a given year was obtained by multiplying the unit of income for a single ton of ore by the total number of tons mined in a given year. The Board rejected the respondent's basis and held that:

The proper manner in which to determine what portion of the payment is principal is to split up the total 1916 present worth into its component parts and to treat the present value of the first year's payment as a return of principal upon the first 1,841,300 tons (the estimated annual production) mined, the present value of the second year's payment as a return of principal upon the second 1,841,300 tons mined, and similarly each year until the mine becomes exhausted, or the principal is all returned.

In this manner the greater part of the amounts received in the first years would represent a return of principal and a small part income, whereas during the last years of the existence of the contract the reverse situation would be true regardless of the income produced by the contract in the various years. For example, under this theory, the amount to be accounted for each year would be $1,064,600, and in the first year approximately 94 per cent would be considered a return of principal, and approximately 6 per cent income, whereas in the forty-fifth year approximately 6 per cent would represent a return of principal and approximately 94 per cent would represent income.

Does the foregoing decision of the Board afford a reasonable basis for the determination of the amount of income of the petitioners from the royalty payments received? It is believed that this question may best be answered by keeping in mind the nature of the asset received when the 1916 transaction was effected. What happened in 1916 was that certain stock was sold for $2,200,000 and a contract which the respondent determined had a fair market value at date of receipt of $1,942,111.46, which value we have approved for lack of evidence showing error on the part of the respondent in making such determination. The contract in question was an income-producing asset in that under its terms the owners thereof were entitled to receive income to the extent of 60 cents a ton on a certain part of the ore that was to be mined and the contract was exhaustible in that it had a value only so long as there remained ore to be mined.

The Board is of the opinion that a proper solution to the question of what part of the royalties received constituted taxable income lies in considering the entire amount of royalties received in a given year as includable in gross income and then in permitting a reasonable deduction therefrom in each year for the exhaustion of the contract. Section 213(a), Revenue Act of 1918, provides in part that gross income—

Includes gains, profits, and income derived from * * * trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. The amount of all such items shall be included in the gross income for the taxable year in which received by the taxpayer * * *.

We can not escape the conclusion that the foregoing provision would require all royalties received to be included in the gross income of the recipients. But all of the amounts received would not be subject to tax for the reason that in the production of this income, the asset which produced this income was gradually being exhausted and Congress provided in section 214(a)(8), Revenue Act of 1918, that there shall be allowed as a deduction from gross income "A reasonable allowance for the exhaustion * * * of property * * *." No one would seriously question that a contract is property, and we think it equally clear that the contract in question is property which is being exhausted in the production of income and, consequently, that a deduction on account thereof is justified under the foregoing provision of the statute. See *Lynch* v. *Alworth-Stephens Co.*, 267 U. S. 364. The difference between the royalties received and the allowance for exhaustion would constitute gain derived from capital which would satisfy the classic definition of income as laid down in *Stratton's Independence* v. *Howbert*, 231 U. S. 399, and since often

reiterated, to the effect that income is the " gain derived from capital, from labor, or from both combined." Here the gain is derived from capital, which capital is in the form of a contract which was received in part payment for stock which was sold and which will be productive of income until exhausted.

Our next question is what constitutes a reasonable allowance for the exhaustion of the contract. Since the value attaching to the contract is on account of royalties to be received as the ore is mined, we are of the opinion that a reasonable allowance in each year is determinable upon the basis of the ore mined. It is true that we are not here seeking to determine depletion in the case of a mine, yet the relationship between the exhaustion of the mine and the exhaustion of the contract are such that we think the same principles would be applicable in each case. The method for computing the deduction for the depletion of mineral deposits, as set out by the Commissioner in his regulations, is on the basis of the annual production. Article 210(b), regulations 45, provides:

When the value of the property at the basic date has been determined, depletion for the taxable year shall be determined by dividing the value remaining for depletion by the number of units of mineral to which this value is applicable, and by multiplying the unit value for depletion, so determined, by the number of units sold within the taxable year. * * *

See also articles 201, 202, 203, and 204 of the same regulations. In *New Creek Co.* v. *Lederer* (C. C. A.), 295 Fed. 433, the court had before it the question of the reasonableness of the Commissioner's regulations with respect to depletion under the Revenue Act of 1916, which embody the same principle which appears in the aforementioned regulations (in so far as material to this discussion), the Government there contending that—

Royalties represented both capital and income and that the allowance for capital depletion which the statute authorized was to be determined by the value in the ground of each ton of coal on March 1, 1913, * * * multiplied by the number of tons mined in the year for which the tax was payable.

In approving the Commissioner's regulations as providing a reasonable depletion allowance, the court said:

* * * On the theory of the statute, as we read it, depletion allowance was intended as a return to the taxpayer of the original cost of the coal so that he may be taxed not on the whole of its sale price in the event that he is an operating owner, or on the full amount of royalties if he is a lessor, but that he may be taxed on the difference between the cost (capital) and the sale price or royalties received (income). (Of course in estimating income on sale price other factors enter.) If he were allowed to deduct in each year the full amount of the sale price or the full amount of the royalties received (as the plaintiff here claims), the practical effect would be that he would, for many years, pay no tax at all, and this regardless of the fact that the total sale price (or total royalties) may, ton by ton, show a profit over the original capital cost. It is

this profit or net income annually earned which the act taxed annually. And in this regard we see no distinction in the application of the principle to a mine owner whose income is royalties and to a mine owner whose income is derived from working the mines and selling the coal. The only difference is that in the latter more factors enter into the calculation. The principle is the same.

We do not find that the Rules and Regulations prescribed by the Secretary of the Treasury for the enforcement of the allowance for depletion under the provisions of the Revenue Act of 1916 are, in view of the subject matter of taxation, unreasonable, or that by these rules the taxable was deprived of the deduction which the statute allowed.

Likewise, in *Lynch* v. *Alworth-Stephens Co.*, *supra*, where it was held that a lessee of a mine is entitled to an allowance for depletion, the court said:

It is said that the depletion allowance applies to the physical exhaustion of the ore deposits, and since the title thereto is in the lessor, he alone is entitled to make the deduction. But the fallacy in the syllogism is plain. The deduction for depletion in the case of mines is a special application of the general rule of of the statute allowing a deduction for exhaustion of property. While respondent does not own the ore deposits, its right to mine and remove the ore and reduce it to possession and ownership is property within the meaning of the general provision. Obviously, as the process goes on, this property interest of the lessee in the mines is lessened from year to year, as the owner's property interest in the same mines is likewise lessened. There is an exhaustion of property in the one case as in the other; and the extent of it, with the consequent deduction to be made, in each case is to be arrived at in the same way, namely, by determining the aggregate amount of the depletion of the mines in which the several interests inhere, based upon the market value of the product, and allocating that amount in proportion to the interest of each severally considered.

The Board is convinced that the foregoing principles which were considered applicable in determining a reasonable allowance for the depletion of a mine would apply with equal force in determining the reasonable allowance for the exhaustion of a contract which is dependent for its value upon the right to receive a royalty upon the content of a mine as the ore is mined and which value will be reduced or exhausted as the ore is taken from the ground.

While in the instant case the respondent divided the royalties received as between a return of capital and income, the result reached is the same as if the entire royalties received had been included in gross income and an allowance for exhaustion of the contract treated as a deduction from this gross income. In fact, the end sought in an exhaustion allowance is to have the capital sum invested in a wasting asset returned to the taxpayer as a charge against income earned by the asset and in this way avoid taxing a return of capital. The entire income earned is not taxable, but only so much thereof as does not represent a return of capital. The return of capital is represented in the case at bar by the exhaustion allowance, which, when deducted from the total royalties received, will

produce the same amount of taxable income as determined by the respondent.

In the instant proceedings we are not attempting to lay down a rule for the determination of a reasonable amount for depletion in the case of a mine. Nor do we attempt to determine what would be a reasonable allowance for the exhaustion of a contract where the facts are substantially different from those which obtain in the instant proceedings. All that we do determine is that the method invoked by the respondent of computing the income from the contract is reasonable and should be sustained in the absence of evidence of error on the part of the respondent in making such determinations. See *Royal Collieries Co.*, 1 B. T. A. 369. The action of the respondent is accordingly sustained.

The foregoing principles, as to the manner in which income from the contract shall be reported are, of course, inconsistent with the method approved by the Board in *Julia Andrews Bruce, supra,* in that under the *Bruce* case, neither the income to be reported nor the allowance for exhaustion bear any necessary relation to the income received in a given year, nor to the extent to which exhaustion has been suffered in the production of this income. It is true that in the valuation of this contract we have based our conclusion as to the fair market value upon the basis of the present worth of the royalties which it was estimated would be received over the life of the contract, but because we followed this method of valuation does not mean that where, for example, the same tonnage of ore was mined in the first year and in the last year of the existence of the contract the greater part of the royalties in one case would be capital and in the other case income. The net income in each case would be the same. The value which we arrived at was such a value as we considered would have resulted had the contract been offered for sale by a person willing to sell and had been acquired by a person willing to buy. In effect, the method followed and the result reached is not essentially different from that in the case of the valuation of a leasehold at March 1, 1913. In such case a value is often assigned to the leasehold for the reason that had it been necessary to renew the lease on that date the rental to be paid would have been greater than was being paid under the terms of the lease negotiated prior to March 1, 1913, and, consequently, we say that there will be a saving over the remaining life of the lease of the difference between the two rental amounts, which reflects a March 1, 1913, value of the leasehold. Even though such value may be arrived at on the basis of the present worth of the savings over the period of years, we have never heard it contended that the deduction allowable in a given year on account of the exhaustion of such a leasehold value should bear any relation

to the present worth value of the saving for such year. The basis for exhaustion of such a leasehold which has been recognized repeatedly by the Board and the courts is either a time or production basis, depending upon the nature of the asset, and that, regardless of the fact that in determining the March 1, 1913, value, the value of the saving for the first year would be greater than for any succeeding year. We do not conceive that the situation with respect to the exhaustion of the contract in question would have been different had the valuation which we arrived at been upon the basis of an offer to buy the contract rather than the present worth method. An offer to buy would necessarily have been predicated upon the profits to be realized from the contract and the profits which were expected to be realized one year hence would have been a greater present value than the profits which were expected to be realized forty-five years from that time, yet had the valuation been fixed on such an offer, it is hardly to be supposed that it would be seriously contended that the income to be reported and the exhaustion to be allowed would bear any relationship to such values. To the extent, therefore, that the opinion in *Julia Andrews Bruce, supra,* is in conflict with the views hereinbefore expressed, the same is overruled.

Reviewed by the Board.

*Judgments will be entered for the respondent.*

PHILLIPS, dissenting in part: The difficulty I encounter in the present case is in reconciling the method by which the capital value of the contract is determined with the method by which the capital returned by each payment is computed. In valuing the contract a method is used which recognizes that payments to be received in the future must be discounted to their present value (Findings 28 and 29). Upon this basis it is recognized that the right to receive royalties from the ores to be mined in the first year of operations is much more valuable than the right to receive royalty from an equal number of tons of ores to be mined several years later. The value of the contract is determined to be the sum of the present value of these future payments (Finding 29). In this manner the value of the contract is determined by assigning a capital value to the royalty upon each ton of ore to be mined in the future, a greater capital value per ton being assigned to the royalty from the first ore mined than to the royalty from the ore which is mined later. It seems to me that if we are to use this method of determining the capital value of the contract, we are not justified in departing from it when the royalties are received and we are called upon to determine what portion of the amount received from each ton mined represents capital value.

606

The rule adopted by the Commissioner and followed by the Board by which a uniform value is assigned to the royalty right in each ton of ore, whether mined in the first year or the last year of operations, may be proper in a large majority of cases, but it seems to me that it can not properly be applied where, as here, in determining the capital value of the contract, capital values have been assigned to the right to receive royalties on these ores which vary according to the time when the ores will be mined. It is my opinion that in such a case the petitioners have received income only to the extent that the royalties received in the taxable years exceed what has been determined to be the present value, at the time the contract was made, of the right to receive the royalties on an equal number of tons of ore. The computation of income upon this basis is no more difficult than the computation of the present worth of the right to receive royalties; it requires, in fact, nothing more than the use of the same tables used in the computation of value.

This principle has received the sanction of the courts in *Hull* v. *McHale* (United States District Court for the Eastern Division of the Northern District of Illinois), not reported, which was affirmed by the Circuit Court of Appeals for the Seventh Circuit in *McHale* v. *Hull*, 16 Fed. (2d) 781, and followed in *Spalding* v. *Reinicke*, not reported, which arose in the same district.

TRAMMELL agrees with this dissent.